IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**SARIN CHHAM,**                                                    Case No. 1:17 CV 1624

      Plaintiff,                                                    Judge John R. Adams

      v.                                                            Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                                                    REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Sarin Chham ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated August 3, 2017). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be affirmed in part, and reversed and remanded in part.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in May 2014, alleging a disability onset date of October 1, 2013. (Tr. 187). His claims were denied initially and upon reconsideration. (Tr. 124-30, 135-39). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 142). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on May 4, 2016. (Tr. 36). On July 6, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 19). The Appeals Council denied Plaintiff's request for review, making the hearing decision

the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481. Plaintiff timely filed the instant action on August 3, 2017. (Doc. 1).

## FACTUAL BACKGROUND

Personal Background and Testimony

Plaintiff was born in May 1962, making him 52 years old on his application date, and 51 on his alleged onset date. (Tr. 208). Plaintiff had a second-grade education and completed a machine shop class in 1985. (Tr. 213). Plaintiff lived with his wife, and had two adult children who did not live in the home. (Tr. 43). Through an interpreter, Plaintiff testified he participated in basic household chores, and helped his wife cut the grass in the front yard with a few rest breaks. (Tr. 33). He testified the front yard measured approximately 20 feet by 30 feet. *Id*.

Plaintiff drove a car, but only when necessary or in case of an emergency. (Tr. 44). He stated this limitation was due to "tingling of [his] hand[s] and feet". *Id*. When asked by his attorney whether these symptoms "have gotten worse, or better, or about the same", Plaintiff replied, "[i]t's just getting worse". (Tr. 50).

On a normal day, Plaintiff "exercise[d] and stud[ied] a little bit and watch[ed] movie[s] a little". (Tr. 46). Plaintiff stated he was not working, but helped his wife at a flea market food stand on weekends. *Id*. He provided companionship and assisted with small chores. *Id*. Further, Plaintiff testified the heaviest thing he lifted when helping were jugs of water weighing five to ten pounds. *Id*.

Plaintiff last worked in a restaurant in 2013. (Tr. 46). He testified his duties included everything from cleaning to cooking to waiting tables. *Id*. He worked approximately six hours per day, seven days per week. (Tr. 46-47). Plaintiff estimated he lifted approximately ten pounds at a

time. (Tr. 48). Before his condition worsened, he could lift a 50-pound box of chicken with no problems. *Id.*

Finally, Plaintiff testified he worked with his brother in a neon light business from 1997 to 2000. (Tr. 49). Plaintiff worked with glass tubes, and lifted less than five pounds at a time. *Id.*

Relevant Medical Evidence

Just prior to his alleged onset date, Plaintiff underwent cataract surgery in his left and right eyes on August 28, 2013, and October 2, 2013, respectively. (Tr. 323, 333).

In September 2013, during a visit with Lisa Roth, DPM, Plaintiff was diagnosed with diabetic neuropathy of the feet. (Tr. 325-26). Plaintiff complained of "some numbness in toes and feet and pain up to the waist", but denied any particular foot problems. (Tr. 326). Dr. Roth recommended Plaintiff follow up with his primary care provider. *Id.*

In mid-October 2013, Plaintiff was seen by Seshadri Jagannathan, M.D., for a follow-up visit to his cataract surgeries. (Tr. 316-18). Plaintiff reported he was "doing well" after the surgeries. (Tr. 317). Plaintiff's blood sugar was 250 during the visit, but he reported no related symptoms. *Id.* Dr. Jagannathan observed pitting edema of the legs, and diagnosed diabetes mellitus with a history of pneumonia status post syndrome of inappropriate antidiuretic hormone secretion ("SIADH"). (Tr. 317-18).

In November 2013, Plaintiff saw ophthalmologist Alex Yuan, M.D., who diagnosed macular edema and diabetic retinopathy. (Tr. 311-12). Plaintiff reported his vision was "a lot better" since the surgeries. (Tr. 312).

In December 2013, Plaintiff followed up with Dr. Jagannathan, and complained of numbness and tingling in both hands and legs. (Tr. 307). Dr. Jagannathan diagnosed Plaintiff with diabetes mellitus and hypertension. (Tr. 308).

Plaintiff followed up with Dr. Yuan in April 2014. Plaintiff reported no new complaints with his vision, and reported that "I think the shot helped a little." (Tr. 299-300). Dr. Yuan administered injections in each eye to help with Plaintiff's macular edema. (Tr. 300). Plaintiff received another set of injections in May 2014. (Tr. 296-98).

In May 2014, Plaintiff saw Chloe Castro, M.D., for a follow-up visit regarding his blood pressure. *See* Tr. 293-96. During the visit, Plaintiff reported he was "increasingly forgetful". (Tr. 294). Dr. Castro referred Plaintiff to a neurologist to address memory concerns. (Tr. 296).

Neurologist Marc Winkelman, M.D., examined Plaintiff in late May 2014 for complaints of memory problems. *See* Tr. 291-93. During the visit, Plaintiff reported he forgot what his wife told him to do, misplaced or lost things, locked keys in a car, and locked himself out of the house. (Tr. 291). Plaintiff reported feeling depressed. *Id*. Plaintiff scored 23 out of 28 on a mini-mental status examination ("MMSE"). (Tr. 293). Dr. Winkelman diagnosed Plaintiff with depression and noted the MMSE results were indicative of dementia, however, the poor performance could be due to a language or cultural problem. *Id*. Dr. Winkelman ordered an MRI, which revealed mild brain atrophy. (Tr. 371).

In June 2014, Plaintiff was seen for an internal medicine follow-up. *See*. Tr. 439-42.[1] During the visit, Kashyap Chandrashekar, M.D., reported Plaintiff "look[ed] well" and his diabetes and blood pressure were "well controlled". (Tr. 441-42). Dr. Chandrashekar found Plaintiff had decreased sensation of the lower extremities, below the knee, and pedal edema. (Tr. 441).

Plaintiff followed up with Dr. Winkelman in June 2014. *See* Tr. 436-39.[2] Plaintiff reported feeling depressed due to financial problems and diabetes. (Tr. 437). Dr. Winkelman noted

---

1. These records are duplicated at Tr. 499-501.
2. These records are duplicated at Tr. 469-99.

4

Plaintiff's coordination and gait were "OK", and Plaintiff was alert. (Tr. 438). Plaintiff declined both medication and a referral for psychiatric treatment for his depression. *Id*. Dr. Winkelman told Plaintiff to follow-up in six months. *Id*.

In July 2014, Plaintiff followed up with podiatrist, Sean McMillin, DPM. *See* Tr. 493-95. Plaintiff reported his diabetes was controlled with medication and insulin. (Tr. 493). A musculoskeletal examination showed full muscle strength and pain-free range of motion in the subtalar joint and metatarsophalangeal joint of the foot. (Tr. 495). Range of motion of the ankle joint was reduced, but pain free. *Id*. Dr. McMillin prescribed diabetic shoes. *Id*.

Two months later in September 2014, Plaintiff saw Maryanne Haddad, D.O., stating he was unable to work due to his chronic leg pain. (Tr. 425). Plaintiff told Dr. Haddad he applied for disability due to the pain. *Id*. Plaintiff was diagnosed with "very advanced" polyneuropathy during the visit and was referred for a disability exam. (Tr. 427).

In December 2014, Plaintiff saw Travis Cleland, D.O., for a nerve conduction and electromyography (EMG) test. *See* Tr. 562-63. The testing showed severe sensory motor peripheral polyneuropathy, which affected the lower extremities. *Id*.

In January 2015, Plaintiff returned to Dr. Winkelman and reported continuing memory issues. (Tr. 661). Plaintiff declined neuropsychological tests to assess his memory problems, and Dr. Winkelman prescribed the antidepressant Celexa. (Tr. 663).

Plaintiff underwent a podiatry exam with Dr. McMillin in March 2015, which revealed mild edema of the feet. (Tr. 670). Plaintiff was diagnosed with pain, edema, and neuropathy of the feet. *Id*.

Three days after his podiatry exam, Plaintiff returned to Dr. Winkelman and reported little improvement with Celexa, and continuing memory issues. (Tr. 675). Dr. Winkelman continued his diagnosis of depressive pseudo-dementia and increased Plaintiff's Celexa dosage. (Tr. 677).

Plaintiff was admitted to MetroHealth Hospital from March 27-29, 2015 due to nausea and vomiting. *See* Tr. 681-82. Plaintiff was diagnosed with severe hyponatremia due to volume depletion and SIADH caused by the Celexa, which was discontinued. (Tr. 681, 689, 691).

Plaintiff returned to Dr. Winkelman in May 2015. (Tr. 741). He reported feeling his memory was no better or worse after stopping Celexa. *Id.* Dr. Winkelman diagnosed Plaintiff with "subjective memory loss – depressive pseudo-dementia v dementia", and ordered further neuropsychological testing. *Id.*

In August 2015, Eric Berko, Ph.D., conducted a mental health assessment *See* Tr. 765-70. Dr. Berko was "[n]ot quite sure why [Plaintiff] was here today." (Tr. 766). Plaintiff reported worsening memory issues. *Id*. Plaintiff also reported a traumatic head injury he received as a child in Cambodia where he fell out of a second-story window. *Id*. Plaintiff further reported stress regarding his family, work, health conditions, and financial situation. *Id*. Dr. Berko assigned a global assessment of functioning ("GAF") score of 51-60, which indicated "moderate" symptoms[3].

---

3. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32-33 (4th ed., Text Rev. 2000) ("DSM-IV-TR"). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("DSM-V") (noting recommendations "that the GAF be dropped from [DSM–V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). However, as set forth in the DSM-IV, a GAF score of 51-60 indicated "moderate symptoms (e.g., flat affect, and circumstantial speech, occasional panic attacks) or a moderate difficulty in social, occupational, or school functioning (e.g., a few friends, conflicts with peers or co-workers)." DSM-IV-TR at 32.

(Tr. 770). Dr. Berko diagnosed Plaintiff with pseudo-dementia, and PTSD with a depressive disorder. *Id*.

Plaintiff returned to Dr. Berko for a follow-up session in October 2015. *See* Tr. 835-36. Plaintiff reported continued stress and anxiety. *Id*. Plaintiff told Dr. Berko he felt "more stressed than depressed". (Tr. 836). Plaintiff reported his primary stressors as financial, and noted he had not heard anything about his disability claim which had been denied twice. *Id*. Dr. Berko observed depressed and anxious mood, constricted affect, appropriate language, good judgment and insight, normal memory, and logical, organized thought process. *Id*.

Opinion Evidence

*Treating Physician*

In May 2015, Dr. Winkelman completed a check-box, medical capacity assessment for Plaintiff during his visit. *See* Tr. 746-47. Dr. Winkelman found Plaintiff to have a rare[4] ability in 8 out of 22 areas of functioning, and an occasional[5] ability in 13 of 22 areas of mental functioning. *See id.* Dr. Winkelman opined Plaintiff could rarely: use judgment, maintain attention and concentration, interact with supervisors, and deal with stress. *Id*. He thought Plaintiff could occasionally: follow work rules, deal with the public, relate to coworkers, and work without being distracting. *Id*. Plaintiff could "constant[ly]"[6] maintain his appearance. (Tr. 747).

---

4. A "rare" ability was defined as an "activity [which] cannot be performed for any appreciable time." (Tr. 746).
5 . An "occasional" ability was defined the "ability for activity [which] exists for up to 1/3 of work day." *Id*.
6. A constant ability was defined as having an "unlimited ability" to perform. *Id*.

*Examining Physicians*

*Dr. Ward*

In October 2014, Plaintiff underwent a psychological consultative examination at the request of the Social Security Administration with Christopher Ward, Ph.D. *See* Tr. 464-70. On examination, Plaintiff was cooperative and established a rapport. (Tr. 467). Plaintiff presented as depressed during the interview with a "flat" affect and "downcast" facial expression. *Id*. Plaintiff was alert, fully oriented, and responsive to all questions. *Id*. Dr. Ward noted "[Plaintiff's] presentation was indicative of mild neurocognitive impairment due to his difficulties with attention and focus." *Id*. Dr. Ward administered a Wechler Memory Scale, which indicated Plaintiff had an Immediate Memory Index of 81, which fell at the tenth percentile for his age group. (Tr. 468). Plaintiff's Delayed Memory Index of 78 fell at the seventh percentile for his age group. *Id*.

Based on his examination, Dr. Ward concluded Plaintiff was able to converse effectively, but had difficulty remembering simple instructions and did not perform adequately on visual working memory. (Tr. 469).   Further, Dr. Ward noted Plaintiff displayed indications of distraction during the evaluation including requests to repeat questions, and "failed to display effective task persistence when answering questions". *Id*. Plaintiff presented as depressed during the evaluation; Dr. Ward opined this depression might affect his level of engagement with co-workers and supervisors. *Id*. Plaintiff did not report any problems with authority figures. *Id*. Finally, Dr. Ward found "[Plaintiff] presented with below average cognitive ability to adapt to work pressures, and he may have difficulty responding to changes in work environments." (Tr. 470).

*Dr. Lewis*

In November 2014, Plaintiff saw Jenna Lewis, O.D., for a consultative eye examination. *See* Tr. 538-40. Dr. Lewis found Plaintiff had significant diabetic eye disease with the right eye

being more advanced than the left. (Tr. 539). Further, Dr. Lewis opined Plaintiff "should not work at heights or in any hazardous situation. Driving would be limited to daytime only in familiar areas. Reading would require larger print and claimant may fatigue easily." (Tr. 540).

*Dr. Huang*

Also in November 2014, Plaintiff was examined by Shu Huang, M.D., a physical medicine and rehabilitation physician, at another physician's request. *See* Tr. 506-08, 525-26. Plaintiff reported trouble with his eyesight, as well as having no feeling in his legs and right upper arm "to the point that he [did] not feel safe to drive." (Tr. 525). Based upon Plaintiff's reported symptoms, and the physical evaluation, Dr. Huang noted Plaintiff "[did] look like he ha[d] a lot of peripheral polyneuropathy." *Id.*

During the examination, Plaintiff reported to Dr. Huang he was able to stand for 30 minutes at a time and could walk approximately one block. (Tr. 526). Further, Plaintiff estimated he could carry 30 pounds at a time. *Id.* Dr. Huang had Plaintiff carry various weights to demonstrate and observed Plaintiff lift 5-10 pound weights and a box that weighed "more than 13 pounds". *Id.* Dr. Huang concluded Plaintiff "could lift up to about 20 pounds for sure." *Id.*

Dr. Huang's above findings were outlined in a letter to the referring physician, Dr. Haddad. (Tr. 525-26). Dr. Huang informed Dr. Haddad he did not complete the functional capacity form for Plaintiff because:

> if there is anybody needing the functional capacity test, it is better if you manage to do it yourself since you know the patient much better than I do. It is tough for us to fill out the form, seeing the patient one time, especially, if there is no paperwork and the patient comes here that will make it harder. I will try to put a note here, so that if the social security paper does come in, I can fill it out as I read my own note and try to send it out.

(Tr. 525). Dr. Huang then ordered a nerve conduction study "to help his social security get through", and thought "maybe it will help . . . to document how bad the neuropathies are." (Tr.

526). That testing, discussed above, showed severe sensory motor peripheral polyneuropathy, which affected the lower extremities. (Tr. 562-63).

In October 2015, Dr. Huang completed a check-box, physical capacity form. *See* Tr. 748-49. Dr. Huang concluded Plaintiff could lift 20 pounds occasionally, and 10 pounds frequently. (Tr. 748). Further, Dr. Huang found Plaintiff could stand or walk 30 minutes continuously and four hours total during a typical eight-hour workday, and sit for one hour continuously, and four hours total. *Id.* Dr. Huang found Plaintiff could occasionally climb, balance, stoop, crouch, kneel, crawl, reach, push and pull, and perform fine and gross motor manipulation. (Tr. 748-49). Dr. Huang listed "neuropathy" and "peripheral neuropathy" as the medical findings that supported his assessment. *Id.* Dr. Huang attached the results of the EMG test to his assessment. *See* Tr. 750-52.

*Reviewing Physicians*

In November 2014, state agency physician Jung Kim, M.D., reviewed Plaintiff's records and completed a Mental Residual Functional Capacity Assessment. *See* Tr. 72-74. Dr. Kim found Plaintiff was "moderately limited" in his ability to understand and remember detailed instructions, noting that "[Plaintiff] may experience some problems with understanding instructions but would be able to understand simple 1-3 step instructions." (Tr. 73). Further, Dr. Kim concluded Plaintiff would work best in an environment where there are infrequent changes in his routine. (Tr. 74). Dr. Kim noted "poor performance on testing but this may be due to language difficulties." *Id.*

In January 2015, state agency physician Rannie Amiri, M.D., reviewed Plaintiff's records and provided a Physical Residual Functional Capacity Assessment. *See* Tr. 101-03. Dr. Amiri concluded Plaintiff could stand or walk six hours in an eight-hour workday, or sit six hours in an eight-hour workday. (Tr. 102). Dr. Amiri found Plaintiff could lift twenty pounds occasionally,

and ten pounds frequently. *Id*. Further, Dr. Amiri found Plaintiff could occasionally crawl, frequently climb ramps and stairs, but never climb ladders, ropes, and scaffolds. (Tr. 102-03).

The next day, state agency physician Robyn Hoffman, Ph.D., reviewed Plaintiff's records and provided an opinion regarding Plaintiff's mental functioning. *See* Tr. 103-05. Dr. Hoffman assessed the same limitations Dr. Kim provided two months earlier. *See* Tr. 72-74.

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 53-60. The ALJ asked the VE to consider a person with Plaintiff's age, education, and vocational background who was limited in the way the ALJ determined Plaintiff was. (Tr. 56). The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs such as a cleaner, housekeeping, cafeteria attendant, or laundry folder. *Id*.

ALJ Decision

In a decision dated July 6, 2016, the ALJ first concluded Plaintiff had not engaged in substantial gainful activity since his application date. (Tr. 21). The ALJ found Plaintiff had severe impairments of polyneuropathy diabetes, diabetic retinopathy (right greater than left), depression, organic mental disorder (neurocognitive disorder), and post-traumatic stress disorder. *Id*. None of these impairments – individually or in combination – met or medically equaled a listed impairment. (Tr. 23). Next, the ALJ concluded:

> the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally lift and carry 20 pounds, and he can frequently lift and carry 10 pounds. He can stand and walk 6 hours of an 8-hour workday. He can sit for 6 hours of an 8-hour workday. He can frequently operate foot controls bilaterally. He can frequently climb ramps and stairs. He can never climb ladders, ropes, or scaffolds. He can only occasionally crawl. He must avoid all exposure to hazards such as commercial driving, operating dangerous machinery, and unprotected heights. In addition, claimant can perform simple, routine tasks consistent with unskilled work with no

fast pace or high production quotas and with infrequent changes. Additionally, the claimant can frequently handle and finger bilaterally.

(Tr. 25). Further, the ALJ found Plaintiff unable to perform any past relevant work. (Tr. 29). The ALJ found Plaintiff was 51 years old, had a marginal education, and was able to communicate in English. (Tr. 29-30). Relying on testimony from the VE, the ALJ concluded Plaintiff could perform jobs that exist in significant numbers in the national economy such as a cleaner/housekeeper, cafeteria attendant, or folder/laundry. (Tr. 30-31). Therefore, the ALJ concluded Plaintiff was not disabled. *Id.*

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ violated the treating physician rule when she failed to properly evaluate the opinions of Drs. Winkelman and Huang. Plaintiff asserts Dr. Winkelman's opinion

was rejected without good reason, and a portion of Dr. Huang's opinion was also improperly rejected. For the reasons discussed below, the undersigned finds the ALJ properly discounted the opinion of Dr. Winkelman and gave several supported reasons for doing so. As to Dr. Huang, the undersigned agrees with the Commissioner she is not a treating physician. However, the undersigned finds the ALJ erred with respect to Dr. Huang. Therefore, the undersigned recommends the decision of the Commissioner be affirmed in part, and reversed and remanded in part.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers,* 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004)).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir. 2010).

When determining weight and articulating "good reasons", the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

The regulations also provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). As to non-treating medical sources, the regulations require ALJs to weigh their opinions "based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)). Although the ALJ need not provided "good reasons" for the weight assigned to non-treating source opinion, the findings made must still be supported by substantial evidence.

*Dr. Winkelman*

Plaintiff argues the ALJ erred in failing to provide "good reasons" for not granting controlling weight to Dr. Winkelman's opinion. The Commissioner responds the ALJ properly discredited Dr. Winkelman's opinion and gave good reasons for doing so. The undersigned agrees with the Commissioner, and finds the ALJ provided the required "good reasons" for discounting Dr. Winkelman's opinion.

In her analysis, the ALJ summarized Dr. Winkelman's opinion and the reasons for the weight assigned:

15

Dr. Winkelman opined that the claimant could occasionally to rarely make occupational adjustments in areas including, but not limited to following work rules, using judgment, maintaining attention, interacting with co-workers and supervisors. [citing Tr. 746]. He further opined that the claimant could rarely understand complex instructions and occasionally understand simple instructions. [*Id.*]. Finally, he opined that the claimant could occasionally socialize and behave in an emotionally stable manner as well as occasionally perform other social activities. [*Id.*].

The undersigned gives the opinion of Dr. Winkelman little weight, because it is generally inconsistent with the record as a whole. For example, the doctor opined that the claimant can rarely interact with supervisors. [citing Tr. 746]. However, the claimant has denied any issues with authority figures. [citing Tr. 469]. Similarly, the claimant has described positive relationships with friends and family. [*Id.*]. This is also evidence that the claimant can interact with co-workers or supervisors. The opinion is extremely limited and only states one area that the claimant can constantly perform, which is maintaining his appearance. [citing Tr. 466]. Nonetheless, the undersigned concurs with the doctor's opinion that the claimant would be limited in complex tasks and instructions because of his depression and cognitive impairment. Overall, however, the undersigned gives this opinion little weight, because the extreme limitations are not consistent with the evidence.

(Tr. 27-28).

Here, the ALJ gave reasons for discounting the opinion of Dr. Winkelman, and points to evidence in the record for support. First, the ALJ gave special attention to the inconsistencies between the extreme limitations assigned by Dr. Winkelman as compared to the record as a whole. (Tr. 28). Specifically, Dr. Winkelman found Plaintiff had "occasional" or "rare" abilities all areas of functioning except maintaining appearance. (Tr. 746-47). Dr. Winkelman found Plaintiff could only rarely or occasionally interact and relate with co-workers and supervisors, follow rules, deal with the public, and understand or remember job instructions. *Id*. These limitations contradict Dr. Winkelman's own treatment notes wherein he found Plaintiff's poor MMSE scores suggest "language and culture problems may be the cause . . . not dementia, maybe depressive dementia, maybe no dx at al[l]." (Tr. 293). Additionally, as the ALJ points out, the limitations also contradict the findings of psychologist Dr. Ward. *See* Tr. 469 ("The [Plaintiff] has some friends and family

16

with whom positive relationships were described. [Plaintiff] did not describe a significant history of problems with authority figures."); *see also* Tr. 470 ("[Plaintiff] did not describe anxious symptoms that would compromise his ability to respond to work pressures").

Dr. Winkelman's findings also contradict those of Dr. Berko, to whom the ALJ assigned significant weight. (Tr. 28). Dr. Berko assigned a global assessment of functioning ("GAF") score of 51-60 which indicated "moderate" symptoms. (Tr. 770). The ALJ assigned the GAF score "significant weight to the extent that it shows a moderate limitation in concentration, persistence, or pace, which would limit the claimant to simple tasks." *Id*.

The ALJ did not deny Plaintiff had functional limitations. To the contrary, the ALJ concurred with Dr. Winkelman to some degree, acknowledging "[Plaintiff] would be limited in complex tasks and instructions because of his depression and cognitive impairment." (Tr. 28). However, as the Sixth Circuit has held, an ALJ "must give the opinion of a treating source controlling weight if he finds the opinion . . . 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)); *see also Bogle v. Sullivan,* 998 F. 2d 342, 347 (6th Cir. 1993) ("This court has consistently stated that the Secretary is not bound by the treating physician's opinions, and that such opinions receive great weight only if they are supported by sufficient clinical findings and are consistent with the evidence.") . Here, the ALJ pointed out the extreme limitations assessed by Dr. Winkelman were not consistent with the record evidence as a whole, and thus they were discounted. The undersigned therefore finds the ALJ provided good reasons for her treatment of Dr. Winkelman's opinion and recommends the decision be affirmed in this regard.

*Dr. Huang*

Plaintiff next argues the ALJ failed to provide good reasons for rejecting Dr. Huang's October 2015 physical residual functional capacity assessment in violation of the treating physician rule. The undersigned finds Dr. Huang is not a treating physician as defined in 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). However, the undersigned agrees with Plaintiff that the ALJ's failure to acknowledge Dr. Huang's October 2015 assessment is error. The undersigned finds this error is not harmless because that assessment directly contradicts the ALJ's ultimate RFC. *See* Tr. 24. Thus, the undersigned recommends this finding be reversed and remanded.

First, the undersigned agrees with the Commissioner that Dr. Huang is not a treating physician to whom the ALJ was required to give heightened weight. Plaintiff was referred to Dr. Huang by his treating physician, Dr. Haddad, for an examination and functional capacity evaluation. *See* Tr. 525 (noting "[Plaintiff] is seen today in the clinic without any paperwork, but does want me to fill out the social security paper for him."). Dr. Huang examined Plaintiff once during the November 2014 visit, and recommended Plaintiff "get a nerve conduction study to document how bad the neuropathies are" in order to "help his disability get through". (Tr. 525).

In his letter to Dr. Haddad dated November 17, 2014, Dr. Huang summarizes precisely why he cannot be considered a treating physician:

> As you know, if the patient comes here without the functional capacity paper, it is pretty tough for us to fill any forms, and it does make it much harder, so I think in the long run if there is anybody needing the functional capacity test, it is better if you manage to do it yourself *since you know the patient much better than I do*. It is tough for us to fill out the form, *seeing the patient one time*, especially, if there is no paperwork and the patient comes here that will make it even harder. I will try to put a note here, so that if the social security paper does come in, I can fill it out as I read my own note and try to send it out.

(Tr. 525) (emphasis added). Further, the Sixth Circuit held one or two visits does not transform a physician into a treating physician. *See Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 506

18

(6th Cir. 2006) (holding that a single examination did not suffice to render someone a treating physician); *see also Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) ("The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records."). Thus, the undersigned concludes Dr. Huang is not a treating physician.

In her analysis, the ALJ summarized Dr. Huang's opinion and explained her reasons for assigning significant weight:

> On November 17, 2014, Shu Que Huang, M.D. opined that the claimant could lift 20 pounds [citing Tr. 526].
>
> The undersigned gives the opinion of Dr. Huang significant weight, because it is consistent with her examination of the claimant. The claimant was able to lift a 13 pound box upon examination. [citing Tr. 526]. It is also consistent with the claimant's estimation that he can lift about 30 pounds. (*Id.*). The undersigned similarly finds that the claimant can lift 20 pounds occasionally and 10 pounds frequently.

(Tr. 27). The findings listed above regarding Plaintiff's lifting abilities are contained within Dr. Huang's November 2014 letter, to which the ALJ cited. *See* Tr. 526.

The ALJ did not mention or cite the restrictions contained within Dr. Huang's October 2015 functional assessment anywhere in her opinion. *See* Tr. 19-31. As noted above, the regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(c). As to non-treating medical sources, the regulations require ALJs to weigh their opinions "based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling." *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c). Although the ALJ need not provide

"good reasons" for the weight assigned to non-treating source opinion, the ALJ's findings must still be supported by substantial evidence.

Although the lifting restrictions of Dr. Huang's October 2015 opinion are consistent with the RFC, other opined restrictions are inconsistent. The ALJ found Plaintiff could stand, walk, and sit for six hours of an eight-hour workday. *See* Tr. 24-25. By contrast, Dr. Huang indicated Plaintiff was limited to standing, walking, and sitting for only four hours of an eight-hour workday. *See* Tr. 748. Further, Dr. Huang indicated Plaintiff could only stand or walk for 30 minutes at a time without interruption, and could only sit for one hour without interruption. *Id.* The ALJ assigned "significant weight" to Dr. Huang's opinion that Plaintiff could lift twenty pounds, as opined in his November 2014 letter. (Tr. 27) (citing Tr. 526). He did not acknowledge or address the additional sitting, standing, or walking restrictions in Dr. Huang's October 2015 form.

The undersigned agrees with Plaintiff and recognizes the inconsistencies between the ALJ's RFC findings and Dr. Huang's assessment must be formally addressed. The ALJ may have properly rejected the October 2015 check-box opinion due to the lack of a treatment history between Dr. Huang and Plaintiff, or (as the Commissioner now argues) the opinion's inconsistencies with the rest of the medical evidence. However, the ALJ's opinion does not indicate if she was even aware of the opinion's existence, much less that she evaluated its contents. Adopting this rationalization would be improper post-hoc justification for the ALJ's conclusion. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x. 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency). For these reasons, the undersigned recommends the ALJ's decision be reversed and remanded to address Dr. Huang's October 2015 opinion.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI and DIB not supported by substantial evidence and recommends the decision be affirmed in part, and reversed and remanded in part pursuant to Sentence Four of 42 U.S.C. § 405(g).


 s/James R. Knepp II
United States Magistrate Judge


*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).